**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| Feld Motor Sports, Inc. *and* | |
| Feld Entertainment, Inc. | CIVIL ACTION NO. 1:22-mc-26 |
|     *Movants*, | |
| v. | |
| Fédération Internationale de Motocyclisme, | |
|     *Respondent*. | |

## <u>MOTION OF FELD MOTOR SPORTS, INC. AND FELD ENTERTAINMENT, INC. TO STAY ARBITRATION</u>

Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16; the All Writs Act, 28 U.S.C. § 1651; the Virginia Code, Va. Code Ann. §§ 8.01-581.02 and 8.01-581.013; and Federal Rule of Civil Procedure 7(b), Movants Feld Motor Sports, Inc. ("FMS") and Feld Entertainment, Inc. ("FEI") (collectively, "Movants") submit this motion to stay the arbitration filed by Respondent Fédération Internationale de Motocyclisme ("FIM") in the Court of Arbitration for Sport ("the CAS") in Switzerland.  FIM filed for arbitration despite that FEI has never entered any agreement to arbitrate with FIM, and the agreement between FMS and FIM, which is FIM's basis for asserting its claims are arbitrable, had expired a year before FIM filed its demand for arbitration.  FIM's arbitration with CAS is also an improper attempt to circumvent a pending examination by the United States Patent and Trademark Office ("USPTO") of applications that FIM filed in February 2022 seeking to establish the right to exclusive use of the highly

descriptive, if not generic terms "Supercross Grand Prix" and "Supercross World Championship."

For the foregoing reasons, Movants respectfully request that this Court enter an order permanently staying FIM's arbitration before the CAS.  In support of this motion, FMS and FEI state as follows:

## PARTIES

1.      Movant Feld Motor Sports, Inc. ("FMS") is a Delaware corporation with offices in Palmetto, Florida and Vienna, Virginia.  FMS is a wholly owned subsidiary of FEI.  FMS operates a variety of motor sports properties, including the world-famous supercross series now known as Monster Energy AMA Supercross ("FMS Supercross").  Supercross is a professional sport involving stadium-based motorcycle racing.

2.      Movant Feld Entertainment, Inc. ("FEI") is a Delaware corporation with offices in Palmetto, Florida and Vienna, Virginia.  FEI is the parent company of FMS.  FEI is a worldwide leader in live entertainment, and its organization has produced shows in more than seventy-five countries on six continents.

3.      Respondent Fédération Internationale de Motocyclisme ("FIM") is organized under the laws of Switzerland with its principal place of business in Mies, Switzerland.  FIM is a non-governmental international organization that serves as a sanctioning body for motorcycle sports.

## JURISDICTION & VENUE

4.      Movants FEI and FMS are Delaware corporations headquartered in Florida with legal operations based in Virginia.  Defendant FIM is a Swiss entity headquartered in Switzerland.  This Court thus possesses subject matter jurisdiction over this action pursuant to 28

U.S.C §§ 1331, 1332(a)(2) and 28 U.S.C. § 1651.  The amount in controversy exceeds $75,000, as FIM is seeking damages of 678,375 Swiss Francs (approximately $700,000 U.S. dollars) in the claim it filed with the CAS.

5.     This Court has personal jurisdiction over FIM because the injuries suffered by Movants arise out of FIM's contacts with the United States, which include FIM's unfounded allegations that it is entitled to exclusive ownership of what are highly descriptive, if not generic terms; FIM's attempt to restrain and penalize Movants for FMS's use of those highly descriptive, if not generic terms when describing the FMS Supercross events (that are held in the United States); and FIM's trademark applications filed with the USPTO in Alexandria, Virginia.

6.     Venue is proper under 28 U.S.C. Section § 1391(c)(3) because FIM is not a resident of the United States, and it is incorporated with its principal place of business in Switzerland.  Additionally, FIM has filed trademark applications relating to the terms at issue with the USPTO in Alexandria, Virginia.

## FACTUAL BACKGROUND.

**A.     The FMS Supercross Series and the FIM-FMS Agreement.**

7.     The arbitration that FIM has filed with the CAS against Movants relates to the FMS Supercross events.

8.     Supercross is a professional motorsport featuring off-road motorcycle racing on a man-made, closed-circuit dirt track inside a sports arena that features obstacles including sharp curves and steep jumps.  It is one of many different types of motorcycle racing events. Supercross originated in the United States, with its inaugural event held in the L.A. Coliseum in 1972.

9.      The operation and ownership of the supercross events now comprising the FMS Supercross passed from various predecessor entities to the current owner, FMS, in 2008.

10.      In September 2008, FMS was formed as a subsidiary of FEI to acquire Live Nation's motor sports business, which included, among other properties, the long-standing, world-famous supercross events initiated decades earlier.

11.      FMS has owned and operated the FMS Supercross series since the 2008 acquisition.

12.      The FMS Supercross is the premier supercross motorcycle racing series, and it features competitors from countries around the world.

**B.      The FIM Agreement and Amendments.**

13.      As part of FMS's 2008 acquisition of motor sports from Live Nation, a contract originally entered into between Dorna Off Road S.L. ("DOR") and FIM on February 16, 2001 ("the Agreement") was assigned to FMS by Live Nation.  *See* Ex. 1.[1]

14.      The Agreement provided that DOR would promote FIM by obtaining the right and obligation to use FIM's name and logo in connection with DOR's own supercross events, thereby increasing public knowledge and awareness of FIM.

15.      In the Agreement, FIM assigned DOR the exclusive audiovisual, promotional, commercial, and marketing rights for FIM's name and trademarks for use in DOR's promotion of the supercross world championship, among other events.[2]

---

[1]      The Agreement is confidential by its own terms, and contains, *inter alia*, pricing information. Accordingly, it is attached in redacted form to provide the excerpts relevant to this Motion and FIM's efforts to arbitrate its trademark claims.

[2]      Three different championships are referenced in the original Agreement between DOR and FIM:  Motocross World Championship, Motocross des Nations, and Supercross World

16.     The Agreement further provided that FIM would serve as the sanctioning body for the supercross events during the term of the Agreement.

17.     The Agreement was amended several times over the years.  On March 9, 2001, it was amended to extend the term of the Agreement through the end of the 2021 supercross season.  *See* Ex. 1 at 17.  On October 30, 2007, the Agreement was amended to consolidate all of Live Nation's supercross events, both the longstanding American Motorcyclist Association ("AMA") events and the FIM/DOR events, into a single championship entitled the "[Title Sponsor] AMA Supercross" to be marketed and branded as a "FIM World Championship."  Both FIM and the AMA would co-sanction the championship that became the FMS Supercross Series. *Id.* at 22.

18.     The Agreement referenced and attached in Exhibit 1 includes two design marks of FIM's, which FIM had submitted for registration with the United States Patent and Trademark Office in 1999.  As discussed below, those registrations were pending in 2001 when the Agreement was initially signed and then subsequently abandoned by FIM.  *Id.* at 15–16.  None of the subsequent amendments to the Agreement purported to grant rights to any trademarks or intellectual property beyond the two specific logos identified in the exhibits to the original agreement.

19.     On June 28, 2021, FMS notified FIM by letter that it would not extend the Agreement upon its expiration at the end of June 2021.  In that letter, FMS expressed appreciation of its long-standing partnership with FIM and stated it would work with FIM to ensure an orderly transition.

---

Championship.  However, only the supercross events were ultimately assigned to FMS, and thus, are the only relevant sport at issue in the present matter.

20.     The Agreement expired on June 30, 2021.

**C.     FIM's Improper Arbitration Complaint Filed with a Swiss Sports Tribunal.**

21.     On June 22, 2022, nearly a year after the expiration of the Agreement, FIM filed its arbitration complaint with the CAS.

22.     The CAS is a sports arbitration tribunal in Switzerland that handles primarily two types of sporting disputes: (1) commercial contract disputes related to matters such as sponsorship, television rights, the staging of sports events and player transfers; and (2) disciplinary actions, including anti-doping disputes.  It has no jurisdiction to establish or grant trademark rights, especially not in a foreign country such as the United States.

23.     In its arbitration complaint, FIM claims exclusive rights to and seeks an order under Swiss law from the CAS that Movants cannot use the terms "world," "world championship," "international," "grand prix," or "GP," (collectively, "the Arbitration Terms") in connection with FMS's supercross events held in the United States or anywhere else.

24.     FIM also requested that the CAS arbitrators impose "provisional measures" involving daily monetary penalties, damages, and injunctive relief against Movants for any use of the Arbitration Terms.  FIM has never demonstrated, or even attempted to demonstrate, any exclusive rights to the Arbitration Terms.

25.     FIM's purported basis for bringing its dispute before the CAS is an arbitration provision in the expired Agreement which provided, "Any dispute arising from or related to the present contract will be submitted exclusively to the Court of Arbitration for Sport in Lausanne, Switzerland and will be resolved definitively in accordance with the Code of Sports related Arbitration . . . ."  *See* Ex. 1, Page 13, Section 14.

26.     Movants objected repeatedly to CAS's jurisdiction.

27.     On August 24, 2022, the CAS denied FIM's requests for provisional measures. The CAS also declined to rule on the threshold matter of its jurisdiction.  Instead, it deferred the question of its "competence" (jurisdiction) to be determined at the hearing in Switzerland on the merits of FIM's claims, effectively forcing FEI and FMS to arbitrate prior to any determination that it actually possesses jurisdiction over Movants such that they should be compelled to arbitrate.

28.     FEI is not—and has never been—an assignee, signatory, or party to the Agreement or to any other agreement with FIM, and thus has never agreed to arbitrate FIM's claims.

29.     Though FMS was party by assignment to the Agreement, that Agreement expired nearly a year prior to FIM's arbitration filing.

30.     The Agreement contains no survival language that would extend the effectiveness of the arbitration provision beyond the Agreement's expiration.  Instead, the Agreement expressly stated that upon expiration:

> [A]ll rights granted under this Agreement shall automatically revert to the FIM and DOR shall not have any rights or obligations herein pursuant to said agreement.

*See* Ex. 1, Page 12, Section 10.4.

31.     FIM's claims against Movants do not arise out of or relate to the expired Agreement.  Instead, FIM wants to establish a trademark right that it never had during the Agreement.  The proper forum to test the validity of a U.S. trademark claim is with the USPTO or a U.S. court, not through an arbitration with the CAS in Switzerland.

32.     Ironically, in February 2022—nearly eight months after the Agreement expired and four months before filing its demand for arbitration—FIM filed applications with the

7

USPTO to register the highly descriptive, if not generic terms "Supercross World Championship" and "Supercross Grand Prix" (the "USPTO Application Terms"), among others.[3]

33.     Nothing in the expired Agreement recognized, created, granted, or acknowledged any right relating to the Arbitration Terms or the USPTO Application Terms over which FIM now claims exclusive control before the CAS.

**D.     At the Behest of Its New Partner, FIM Takes an Aggressive, Unsupportable Post-Agreement Position that it Owns Exclusive Rights to the Arbitration Terms.**

34.     In December 2021, FIM entered into a contract with its new supercross promoter, SX Global.[4]

35.     SX Global does not currently, and has not previously, held supercross events in the United States.

36.     The same month that FIM entered its contract with SX Global—nearly six months after the expiration of the Agreement—FIM initiated an aggressive letter-writing campaign in which it demanded, on December 15, 2021; January 3, 2022; and February 15, 2022, that Movants cease all use of the terms "world championship," "world," "grand prix," "GP," and "international" in connection with the FMS Supercross series in the United States.[5]

---

[3]   FIM's post-Agreement applications with the USPTO (collectively referred to as the "Post-Agreement Applications") filed on February 26, 2022, include word marks bearing the terms "FIM Supercross GP" (*see* Trademark App. No. 97286242); "FIM Supercross Grand Prix" (*see* Trademark App. No. 97286234); "Supercross Grand Prix" (*see* Trademark App. No. 97286239; "Supercross World Championship" (*see* Trademark App. No. 97286230), and "FIM Supercross World Championship" (*see* Trademark App. No. 97286229).  *See* Ex. 3.

[4]   Although FIM has referred to and invoked its contract with SX Global in letters to bolster its claims against FMS, FIM has not disclosed its contract with SX Global.  Nor is SX Global a party to the arbitration.

[5]   These are the Arbitration Terms over which FIM now claims exclusive rights in its arbitration filed with the CAS.

37.     In those letters, FIM asserted an exclusive right to use those terms based on a vague claim of "FIM's rights" allegedly granted under the expired Agreement.

38.     FMS responded in February to FIM by both questioning its overzealous letter-writing campaign and also rejecting FIM's claim to the exclusive rights that it was now asserting for the highly descriptive, if not generic terms.  FMS described in detail how the USPTO has historically required a disclaimer of such terms as "world" or "grand prix" when applying for trademarks.

**E.      FIM's 1999 USPTO Applications and Disclaimers.**

39.     FIM's recent, sweeping assertion of exclusive rights to the Arbitration Terms is in stark contrast to its position taken previously before the USPTO.

40.     In 1999, FIM submitted applications to the USPTO to register two design marks containing the phrases "FIM Supercross World Championship" and "FIM Motocross World Championship," respectively.  *See* Ex. 2.

41.     As part of the examination of those 1999 applications, FIM was required to disclaim language which the USPTO deemed to be generic and/or descriptive in relation to the covered goods and/or services, thereby excluding recognition of exclusive rights to those terms apart from the mark as shown.

42.     Specifically, FIM was required to disclaim—*and did in fact disclaim*—any exclusive right to the terms "SX" and "Supercross World Championship," in connection with Trademark Application No. 75739499, and any exclusive rights in the terms "MX" and "Motocross World Championship" in connection with Trademark Application No. 75739484. *Id.*

43.     FIM's disclaimer of any exclusive right to use the terms "SX" and "Supercross World Championship" was pending at the time it contracted the Agreement with DOR.

44.     Moreover, FIM abandoned those applications altogether a few months after signing the initial Agreement with DOR.  *See id.*

45.     In the two decades during which the Agreement was in effect, FIM did not assert, and made no attempt to secure, exclusive rights in the Arbitration Terms (*i.e.*, "world championship," "world," "international," "grand prix," and/or "GP").  While the Agreement was in effect, FIM did not seek registration of these terms with the USPTO or make any effort to amend the Agreement to recognize any such purported exclusive rights for FIM.

**F.      Months After the Agreement's Expiration, FIM Files New Registrations with USPTO, Which Are Currently Under Examination.**

46.     Months after the expiration of the Agreement, FIM changed tack and filed new trademark applications with the USPTO (the "Post-Agreement Applications") for marks again including highly descriptive, if not generic terms that are the same as, or substantially similar to, those terms that FIM had previously disclaimed any exclusive use rights.  *See* Ex. 3.

47.     The USPTO has not completed its initial examination of FIM's Post-Agreement Applications.  But given the USPTO's past treatment of the terms FIM now seeks to register, it is highly unlikely that FIM's pending applications for the "FIM Supercross GP," "FIM Supercross Grand Prix," or "FIM Supercross World Championship" word marks will mature to registration without either (i) a requirement for disclaimer of "Supercross GP," "Supercross Grand Prix," or "Supercross World Championship;" or (ii) a showing of acquired distinctiveness—which FIM will be unable to make.

48.     Further, it is also highly unlikely that FIM's applications for the "Supercross World Championship" or "Supercross Grand Prix" word marks will mature to registration on the

Principal Register without substantial proof of acquired distinctiveness, since those marks, are in their entirety, highly descriptive, if not generic.

## ARGUMENT

### A.   There Is No Agreement to Arbitrate FIM's Claims.

49.   The issue to be decided on this motion is whether an agreement exists that requires Movants to arbitrate FIM's claims brought before the CAS in Switzerland.

50.   Only a court, and not an arbitration panel, can decide the threshold issue of whether a valid agreement to arbitrate exists, unless there is clear and unmistakable evidence that the parties agreed to have that question decided by the arbitrators. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995).

51.   There is nothing that suggests, let alone provides clear and unmistakable evidence, that the parties agreed that the CAS would decide the specific issue of arbitrability. The expired Agreement on which FIM purports to base its arbitration contained no language stating that an arbitration panel would rule on questions as to whether or not a matter was arbitrable.  It is thus for this Court to decide whether a valid agreement to arbitrate exists.  *Id.* at 944–45.

52.   As explained below, FIM's claim is not subject to a CAS arbitration because: (1) FIM cannot compel arbitration with FEI, a nonsignatory to its agreement with FMS; (2) FIM cannot use an agreement that expired nearly a year before FIM filed for arbitration to compel Movants to arbitrate a post-termination dispute; (3) Movants cannot be compelled to arbitrate trademark claims that neither relate to the expired Agreement nor fall within the scope of the expired arbitration provision; and (4) FIM cannot circumvent the USPTO trademark applications under U.S. trademark law *that FIM itself initiated* while that examination is pending by seeking

an accelerated determination of those and related claims in an arbitration in Switzerland governed by Swiss law.

**B.      The Question of Arbitrability Is for This Court to Decide.**

53.      Movants dispute the existence of a valid agreement to arbitrate—*i.e.*, arbitrability. Arbitrability is a question for this Court, not for the arbitration panel convened by the CAS.

54.      Unless there is "clear and unmistakable evidence" that the parties intended for the arbitration panel to decide arbitrability, a court will decide that issue.  *See First Options*, 514 U.S. at 944 (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)); *see also* Va. Code Ann. § 8.01-581.02(b) ("On application, the court may stay an arbitration proceeding commenced or threatened on a showing that there is no agreement to arbitrate.").[6] This is because the "power of the arbitrator to act is a naked power, not coupled with an interest, which rests upon the continuing consent of the parties" and thus permitting an arbitrator to decide arbitrability where a proper objection to the arbitrator's authority has been lodged would vitiate the consent basis of statutory arbitration.  *King v. Beale*, 198 Va. 802, 807 (1957); *accord Doyle & Russell, Inc. v. Roanoke Hosp. Ass'n*, 213 Va. 489, 494 (1973) ("[T]he resisting party is entitled to a pre-submission judicial determination of arbitrability." (citations omitted)).

55.      The Supreme Court has held that:

> [A] party who has not agreed to arbitrate will normally have a right to a court's decision about the merits of the dispute . . . .  Just as the arbitrability of the merits of a dispute depends on whether the parties agreed to arbitrate that dispute, so the question of 'who has the primary power to decide arbitrability' turns upon what

---

[6]      "[W]hen deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."  *First Options*, 514 U.S. at 944; *see also Amchem Prod., Inc. v. Newport News Cir. Ct. Asbestos Cases*, 264 Va. 89, 97 (2002).

the parties agreed about *that* matter.  Did the parties agree to submit the arbitrability question itself to arbitration?

*First Options*, 514 U.S. at 942–43 (second alteration in original) (citations omitted).

56.     Because an arbitrator lacks any authority unless the parties have consented to such authority, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so."  *First Options*, 514 U.S. at 944 (cleaned up); *accord AT&T Techs.*, 475 U.S. at 649.

57.     Thus, where, as here, the existence of a valid agreement to arbitrate is disputed, and the arbitration provision does not clearly and unmistakably submit the question of arbitrability to arbitration, the court decides the issue.  *Waterfront Marine Const., Inc. v. N. End 49ers Stanbridge Bulkhead Groups A, B & C*, 251 Va. 417, 426 (1996) (citing *First Options*, 514 U.S. at 943–45).

58.     There is no indication that the parties agreed to submit the question of arbitrability to the CAS.  The arbitration provision in the expired Agreement between FMS and FIM did not discuss arbitrability at all, let alone "clear[ly] and unmistakabl[y]" submit that question to the CAS.  It states, in full:

> Any dispute arising from or related to the present contract will be submitted exclusively to the Court of Arbitration for Sport in Lausanne, Switzerland and resolved definitively in accordance with the Code of Sports related Arbitration, [sic] the panel will consist of three arbitrators.  The language of arbitration will be the English language.

Ex. 1, Page 13, Section 14.  The question of arbitrability is thus properly before this Court.  *See First Options*, 514 U.S. at 944–45.

**C.      FEI Did Not Agree to Arbitrate FIM's Disputes Before the CAS.**

62.      Although FMS, as the successor to DOR, was a party to the Agreement after 2008, FEI was not and has never been a signatory, assignee, or party to the Agreement or any other agreement with FIM.

63.      Given that the question of arbitrability is properly before this Court, the Court can summarily decide whether the parties agreed to arbitrate the dispute at issue.  *See* Va. Code Ann. § 8.01-581.02(b) ("Such an issue, when in substantial and bona fide dispute, shall be forthwith and summarily tried and the stay ordered if found for the moving party.").

64.      It is a fundamental principle of contract law that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960).  A nonsignatory to an arbitration agreement cannot be compelled to arbitrate a dispute in the absence of other evidence clearly linking that entity to the Agreement.  *Meridian Imaging Sols., Inc. v. OMNI Bus. Sols. LLC*, 250 F. Supp. 3d 13, 23–26 (E.D. Va. 2017).

65.      The expired Agreement involved only two parties: FIM and FMS (as the ultimate assignee of that agreement from the original signatory).

66.      FEI is a separate corporate entity from FMS and was not, and has never been, a party to the Agreement.  Nor did FEI somehow independently consent to arbitrating disputes under the Agreement that FMS had with FIM.

67.      While FEI is the parent company to FMS, "a corporate relationship alone is not sufficient to bind a nonsignatory to an arbitration agreement."  *Meridian Imaging*, 250 F. Supp. 3d at 23–26.

68.     FMS is the entity that purchased the supercross and other motorsports events from Live Nation in 2008, and it is FMS that has operated FMS Supercross.

69.     FIM has no agreement with FEI to arbitrate disputes before the CAS and no basis to force FEI—a nonsignatory—to arbitrate pursuant to the expired Agreement between FIM and FMS in Switzerland subject to Swiss law.

**D.     The Expired Arbitration Provision Does Not Provide Authority for FIM to Force Movants to Arbitrate Post-Expiration Disputes That Are Not Based on Rights Reserved in the Contract.**

**1.     The Present Dispute Does Not Arise Out of or Relate to the Parties' Contract.**

70.     Only FIM and FMS were parties to the Agreement during the period from 2008 until its expiration in June 2021.  The parties only agreed to arbitrate disputes that arise out of or relate to the parties' contract.  But as shown above, nothing in the parties' contract remotely touched on the issue of whether FIM has the exclusive rights to use generic or highly descriptive terms in connection with supercross events.

71.     No dispute over FMS's use of generic or highly descriptive terms can arise out of or relate to the parties' Agreement, because FIM could not contract to transfer rights to generic or highly descriptive terms that it does not possess.  It is fundamental that no one can transfer more than he or she owns.  *See, e.g.*, *In re Nagel*, 556 B.R. 336, 342 (N.D. Ohio Bankr. 2016) (discussing doctrine of *nemo dat qui non habet*—"he who has not, does not give"—in context of Uniform Commercial Code).  By definition, FIM does not have the right to exclusively use generic or highly descriptive terms, so it could not contract to transfer that right to FMS any more than it could contract to sell FMS the Brooklyn Bridge.  And since FIM could not validly contract to assign the right to use generic or highly descriptive terms, FMS's own right to use those terms does *not* arise out of or relate to anything in the parties' Agreement.

72.     FIM has already admitted that the term "world championship" is merely descriptive and that it did not possess exclusive rights to the phrase "world championship" at the time the Agreement was signed in 2001.  Such admission is evidenced by its disclaimer of both "Supercross World Championship" and "Motocross World Championship" in its 1999 trademark applications.  A trademark examiner may require an applicant to "disclaim an unregistrable component of a mark," or an applicant may "voluntarily disclaim a component of a mark." 15 U.S.C. § 1056(a).  Matter that is "merely descriptive" is unregistrable on the Principal Register absent a recognized showing of acquired distinctiveness.  *Id.* §§ 1052(e) and (f). Whether FIM proactively disclaimed "world championship" or acquiesced to a trademark examiner's requirement that it do so, the fact that it made the disclaimer is effectively an admission that the phrase is inherently descriptive and that FIM had no exclusive rights in the term itself at the time of contracting with DOR.  *See* Fed. R. Evid. 801(d)(2)(B).

73.     To the extent the Agreement said *anything* about the parties' trademark rights, it provided that FMS would have the right to use the "logos registered as per Appendices 1 and 2 to this Agreement."  Ex. 1, Page 5, Section 2.6.  These are the marks, as noted above, for which FIM had filed registrations with the USPTO and then disclaimed the exclusive right to the terms "SX," "Supercross World Championship," "MX," and "Motocross World Championship" by the time the Agreement was signed in 2001.  FIM then subsequently abandoned the applications altogether shortly thereafter.  Nothing in the Agreement's reference to two logos—logos to which FIM ultimately asserted no rights at all—could be construed as bringing the exclusive rights FIM now claims were within the ambit of the Agreement.

74.     The Agreement also granted FMS the right to any "further applications in other territories and/or classes as well as to the registration of new logo/s substituting the one currently

existing." *Id.* No such "further applications" were pursued during the term of the Agreement, and no applications or registrations were made by FMS or FIM for the Arbitration Terms while the Agreement was in effect. Again, nothing in this provision supports an argument that the present trademark dispute relates to the Agreement.

75.     The Agreement contemplated the reversion of "all titles and rights on the logos and trademarks related with the Championships which DOR may own upon termination of this Agreement." *Id.* But as discussed above, when the agreement expired, there *were* no registrations or trademarks for the Arbitration Terms (nor had there previously been any during the term of the Agreement), and thus there were no "titles and rights on the logos and trademarks" to revert to FIM. *Id.*

76.     Simply put, there is nothing in the Agreement that speaks to the Arbitration Terms over which FIM is now asserting exclusive rights of use. FIM's attempted trademark grab is wholly unrelated to the Agreement, and thus would fall outside the arbitration provision even if it were still in effect.

77.     The Agreement has expired, and any obligation FMS may have had to arbitrate with FIM expired along with it. FIM's current arbitration claims arise from post-Agreement events occurring in December 2021 and after, and are based on FIM's recent position to now claim trademark rights to exclusively use words such as "world," "international," "world championship" or "supercross"—which include some of the very rights it denied having and disclaimed when the Agreement was signed more than two decades ago.

**2.      The Arbitration Clause is Not in Effect, and This Dispute Arose Totally Post-Expiration.**

78.     The Agreement between FMS and FIM expired by its own terms on June 30, 2021.  FIM initiated arbitration proceedings nearly a year later, on June 17, 2022, by filing an arbitration demand with the CAS.

79.     Arbitration clauses do not survive the termination of an agreement unless specific circumstances exist:  the matter at issue must have occurred prior to termination of the agreement or been subject to the obligations of the contract.  *Liberty Univ., Inc. v. Kemper Sec. Grp., Inc.*, 758 F. Supp. 1148, 1152 (W.D. Va. 1991).

80.     The Agreement did not contain any provision allowing the arbitration clause to survive the expiration of the Agreement, nor were there any amendments or other agreements providing that the arbitration clause would survive in perpetuity.

81.     Even if FIM's dispute did arise under the Agreement (and, as explained below, it did not) once the agreement expires, "the obligation to arbitrate any dispute arising under it has also expired, since the obligation's source is the agreement's arbitration clause."  *Virginia Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 118 (4th Cir. 1993).

82.     As shown above, this dispute was not subject to the Agreement.  Moreover, the dispute arose entirely after the Agreement expired.  During the life of the Agreement, FIM never claimed the rights it asserts now; the first time it ever suggested it had exclusive rights to the generic or highly descriptive terms was in late 2021 and early 2022, when FIM adopted an aggressive post-contract posture, and FIM did not submit its current applications to the USPTO until February 2022.

**E.     FIM's Submission of a Question of U.S. Trademark Law to a Swiss Sports Tribunal Was Not Contemplated in the Agreement and Violates Public Policy.**

83.     FIM's arbitration demands that Movants cease use of the Arbitration Terms "world championship," "world," "international," "grand prix," and "GP" in the promotion of the FMS Supercross in the United States.

84.     FIM did not possess rights to exclusive use of the Arbitration Terms at any time during the term of the Agreement, and even now, FIM possesses no ownership interest in or exclusive right to use the terms that it seeks to prohibit FMS and FEI from using.

85.     FIM's lack of ownership over the terms is evidenced by its February 2022 applications to the USPTO—filed many months after the expiration of the Agreement— attempting to reserve exclusive rights to the USPTO Application Terms.  *See* Ex. 3.

86.     FIM's attempt to gain exclusive rights to the Arbitration Terms through an arbitration with the CAS in Switzerland represents an impermissible end-run around U.S. law.

87.     FIM has requested that a foreign tribunal rule, as a matter of *Swiss* law, that FIM has the exclusive right to use the highly descriptive, if not generic Arbitration Terms *in the U.S. market*.

88.     FIM asks the CAS to make this ruling while FIM's trademark applications are pending examination by the USPTO.  FIM itself put the USPTO process into motion by submitting applications in February 2022—nearly eight months *after* the Agreement expired.

89.     Principles of general contract law and public policy prevent FIM from obtaining such exclusive rights in the United States to the Arbitration Terms through a Swiss arbitration deciding the matter pursuant to Swiss law.  This is particularly true when the Movants deny any consent or jurisdiction by the CAS to do so.

90.     For FIM to establish its rights to the exclusive use of the Arbitration Terms in the United States, it must seek a determination from the USPTO or a U.S. federal court.

91.     Parties cannot contract this authority away from the USPTO.  *See Callaway Golf Co. v. Kappos*, 802 F. Supp. 2d 678 (E.D. Va. 2011).

92.     In *Callaway*, the parties resolved a patent dispute in a settlement agreement that contained an exclusive arbitration clause.  *Id.* at 681–82.  Years later, the parties' dispute reemerged, and Acushnet initiated an *inter partes* review before the USPTO to reexamine the underlying patent.  *Id.* at 682.  Calloway moved to vacate the proceeding, arguing that the parties' arbitration agreement precluded USPTO review.  *Id.*  The USPTO, and ultimately the District Court, however, disagreed.

93.     The Court observed that, as a matter of basic contract law, "The [US]PTO was not a party to the 1996 settlement agreement and therefore cannot be bound by any of its provisions."  *Id.* at 686.  The USPTO has an independent statutory duty to conduct an *inter partes* review when its jurisdiction is invoked, *id.*, and Calloway could not cite "any caselaw or statute that would allow the [US]PTO to disregard its nondiscretionary duty to begin reexamination[.]"  *Id.*

94.     The Court in *Calloway* concluded that it would violate public policy for an arbitration agreement to divest the USPTO of its statutory jurisdiction.  It noted that patents are "government-granted monopolies that provide the patent holders with tremendous power to suppress competition," so there is "a strong public interest in ensuring that patents are valid."  *Id.*

95.     *Calloway*'s reasoning applies with equal force here.  Like a patent, a federally registered trademark is a property interest that allows the holder the exclusive right to use words or images in interstate commerce.  There is an overwhelming public interest in ensuring that that right be established by the method Congress provided, including the ability of third parties to contest an applied-for registration before a neutral agency with subject-matter expertise.

96.     If an arbitration agreement could shift jurisdiction from the USPTO to a foreign tribunal that is neither familiar with, nor bound by, U.S. law, it would defeat this important public policy.

97.     FIM's arbitration directly implicates this concern: FIM is trying to prevent Movants from using any of the Arbitration Terms in connection with FMS's domestic commercial activities, and FIM is doing so by attempting to circumvent the primary U.S. regulator from the process.

98.     If FIM's USPTO applications survive the trademark examiner's initial review—a fact not likely, especially given that FIM was required to disclaim similar terms when filing its Abandoned Applications in 1999—FMS will then have the opportunity itself to challenge FIM's registration applications with the USPTO.

99.     FIM's attempt to circumvent the U.S. trademark review process *that FIM itself initiated* by filing with the CAS while its U.S. trademark applications are pending before the USPTO is improper and should not be permitted.

## CONCLUSION

100.    There is no agreement by which FEI or FMS agreed to arbitrate the trademark claims FIM has filed with the CAS.

101.    FIM submitted applications for the USPTO Registration Terms to the USPTO in February 2022, and the USPTO's examination is pending.  FIM's attempt to have the CAS resolve its claims over the Arbitration Terms in an arbitration in Switzerland pursuant to Swiss law is without contractual basis, and contrary to public policy insofar as it would preempt the USPTO's examination.

**WHEREFORE**, for the foregoing reasons, Movants FMS and FEI respectfully request that the Court enter an Order permanently staying the arbitration proceedings before the CAS and granting any other relief the Court may deem just and proper.

Date: October 5, 2022                    Respectfully submitted,

_____
Charles Kimmett (VA Bar # 97307)
HWG LLP
1919 M Street, NW, 8th Floor
Washington, D.C. 20036
Telephone: (202) 730-1357 (direct)
Facsimile: (202) 730-1301
ckimmett@hwglaw.com

*Counsel for Movants Feld Entertainment, Inc. and Feld Motor Sports, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

Feld Motor Sports, Inc. and

Feld Entertainment, Inc.

 *Movants,*

v.

Fédération Internationale de Motocyclisme,

 *Respondent*.

CIVIL ACTION NO. 1:22-mc-26

---

### [PROPOSED] ORDER GRANTING PERMANENT STAY OF ARBITRATION

 Having considered Movants Feld Motor Sports, Inc. and Feld Entertainment, Inc.'s Motion to Stay Arbitration and any Opposition thereto, it is, on this ___ day of _____, 2022 hereby

 **ORDERED** that the Motion be and hereby is **GRANTED**.  It is further

 **ORDERED** that the arbitration instituted by Fédération Internationale de Motocyclisme against Movants is permanently stayed.

_____
[Honorable Judge]
U.S. District Court for the Eastern District of
Virginia, Alexandria Division